## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RHONDA OVIST, Ph.D. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNUM LIFE INSURANCE COMPANY | ) CASE NO. |
| OF AMERICA; and | ) |
| UNUM GROUP | ) |
| Defendants. | ) |

## **COMPLAINT**

This is an ERISA claim to recover welfare-benefits after the defendants unlawfully refused to continue to pay benefit payments under the Rollins College Long Term Disability Plan ("LTD Plan). Plaintiff files this action to: (1) recover long-term disability ("LTD") benefits due her under the LTD Plan; (2) enforce rights under the LTD Plan; (3) clarify rights under the terms of the LTD Plan; and ( 4) recover interest, costs and attorneys' fees as provided for by ERISA.

Plaintiff is totally disabled from gainful employment due symptoms from debilitating of various illnesses including Neural Immune Disorder and Fibromyalgia Syndrome. The Social Security Administration determined that plaintiff was disabled from any gainful employment. Defendants determined that the plaintiff was totally disabled and paid her benefits for approximately 4 years and despite no material improvement in her health condition that would allow her to return to work, terminated her claim under the auspices that her symptoms were not verifiable even after the Seventh Circuit Court admonished the defendants for applying such a limitation. *Weitzenkamp v. Unum Life Ins. Co. of America*, 661 F.3d 323 (7th Cir. 20113).

**PARTIES**

1.  The Plaintiff Rhonda Ovist ("Ms. Ovist") is an individual having a usual place of residence in Casselberry, Seminole County, Florida.

2.  The Defendant Unum Life Insurance Company of America ("Unum Life") is an insurance company existing under the laws of the state of Maine having a substantial place of business at 1 Mercantile Street, Worcester, Worcester County, Massachusetts, and is a licensed foreign insurer conducting business in Massachusetts.

3.  The Defendant Unum Group is a corporation existing under the laws of the State of Delaware, having a principal place of business at One Fountain Square, Hamilton County, Tennessee, and having a substantial place of business at 1 Mercantile Street, Worcester, Worcester County, Massachusetts.

**JURISDICTION AND VENUE**

4.  Personal jurisdiction is predicated against all Defendants as they are all doing business in this Commonwealth

5.  This Court has original jurisdiction for ERISA welfare-benefit claims arising under 29 U.S.C. §1132 regarding the relief for sought under ERISA.

6.  Both defendants conduct substantial business in this Judicial District, and specifically in Worcester County, Massachusetts.

## FACTS COMMON TO ALL COUNTS

### A. *Information about Unum Group.*

7.  Unum Group is an insurance holding company that controls the activities of its subsidiaries including Unum Life pursuant to a General Services Agreement and other documents governing the operation of Unum Life and another Unum Group subsidiary, Provident Life and Accident Insurance Company ("Provident").

8.  Neither Unum Life nor Provident  have employees. All persons that conduct the business of Unum Life are employed by the Unum Group. The details of this relationship are set-forth in the affidavit of William T. Bradley of the Unum Group and attached herewith as **EXHIBIT A**.

9.  As the 100% owner of Unum Life, Unum Group is the ultimate controlling entity for Unum Life as indicated on the numerous Annual Statements filed with insurance regulators on behalf of Unum Life

10.  Unum Life, Provident and the Unum Group have a history of parsimonious claim denials specifically set forth in the Findings of and Facts and Conclusions of Law of United States District Judge James C. Mahan dated November 14, 2008, Merrick v. Paul Revere, 594 F.Supp.2d 1168 (D. Nev. 2008). A copy of the Findings of Fact and Conclusions of Law are attached herewith as **EXHIBIT B**.

11. In *Radford Trust v. First Unum Life Insurance Company of America*, 321 F. Supp.2d 226 (D. Mass. 2004), Judge William G. Young of this judicial district recited a litany of cases establishing Unum Group's and Unum Life's "pattern of erroneous and

arbitrary benefits denials, bad faith contract misinterpretations, and other unscrupulous

tactics."

12. Similar conclusions are set forth in a law review article by the leading ERISA scholar,

John H. Langbein, Sterling Professor of Law, Yale University, Trust Law as

Regulatory Law: The Unum/Provident Scandal and Judicial Review of Benefit Denials

under ERISA, 101 Northwestern Univ. Law Review 1315 (2007).

13.  On November 18, 2004, Unum Group entered into the Regulatory Settlement

Agreement ("RSA") with 47 state regulators, including the Commissioner of Insurance

for the Commonwealth of Massachusetts and the State of Illinois. Unum Group

entered into a separate agreement with the Commissioner of Insurance for the State of

California and a few other states. Unum Group paid a $15 million and its companies

agreed to implement a corrective plan of action set forth in the RSA which resulted in

payments approaching $700 million dollars to claimants whose benefits had been

wrongfully denied or terminated.

14. Unum Group agreed that it would be

Affording significant weight to a SSDI award means that the SSA records related
to the SSDI award are reviewed and consideration of the SSA's judgment that a
claimant is disabled for SSDI purposes will generally be an essential element of
the Disability evaluation under the governing Disability contract.

15. On October 3, 2005, Unum Group entered into an amendment to the RSA where Unum
Group agreed that it would be

Giving significant weight to an attending physician's ("AP") opinion, if the AP is
properly licensed and the claimed medical condition falls within the AP's
customary area of practice, unless the AP's opinion is not well supported by
medically acceptable clinical or diagnostic standards and is inconsistent with
other substantial evidence in the record. In order for an AP's opinion to be
rejected, the claim file must include specific reasons why the opinion is not well

supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record.

16. The District Court in *Merrick* specifically refutes any claim that Unum Group and its subsidiaries have changed their ways after having first entered in late 2004 into two separate settlement agreements with insurance regulators in all 50 states and the District of Columbia, sometimes referred to as the California Settlement Agreement and the other as the Regulatory Settlement Agreement:

> d.  [Defendants] Failed to present the testimony of a single current claims handling or management level employee who could testify as to current practices at the company or could testify that any of the types of bad faith conduct evidenced in Merrick's claim file and in the institutional documents had changed.

> e.  Moreover any suggestion that things are different at the company now was belied by evidence that certain regulatory settlements precluded Defendants from being cited for regulatory violations during the claim reassessment process, Ex. 346, and the fact that the high level management of Defendants, who knew and participated in the institutional bad faith practices, remain in place.  For example Thomas Watjen, who was with Provident at the inception of Defendants' bad faith conduct, and who was the head of its finance investment and legal organization at the time of the merger with Revere.

594 F.Supp.2d at 1183.

17.   The Ninth Circuit Court of Appeals wrote in 2012

> Numerous courts, including ours, have commented on Unum's history " 'of erroneous and arbitrary benefits denials, bad faith contract misinterpretations, and other unscrupulous tactics,' " *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 137 (2d Cir.2008) (quoting *Radford Trust v. First Unum Life Ins. Co.*, 321 F.Supp.2d 226, 247 (D.Mass.2004), rev'd on other grounds,  *934 491 F.3d 21, 25 (1st Cir.2007)). Indeed, in *Saffon*, we attributed the trend of state prohibitions on discretionary provisions in insurance contracts to "the cupidity of one particular insurer, Unum–Provident Corp., which boosted its profits by repeatedly denying benefits claims it knew to be valid. Unum–Provident's internal memos revealed that the company's senior officers relied on ERISA's deferential standard of review to avoid detection and

> liability." 522 F.3d at 867; *see also Radford Trust*, 321 F.Supp.2d at 247 n. 20 (collecting cases). Moreover, the CSA notes that Unum was subject to "a multistate targeted examination" of its "claims handling practices," which resulted in a settlement agreement similar to the CSA. And the CSA was the product of investigations by the State of California into Unum's claims handling practices.

*Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 933-34 (9th Cir. 2012)

18. This practice of setting metrics and plan forecasts based on financial criteria, rather than reviewing each claim for benefits individually continues to date. *Unum Group v. Loftus*, 220 F.Supp.3d 143, 146 (D. Mass. 2016) ("On September 21, 2016, Loftus was interviewed by Unum's in-house counsel as part of an internal investigation into claims practices."). Apparently, Unum investigated Mr. Loftus "coding claim closures to achieve performance metrics and/or plan forecasts;" This is disclosed in an Upjohn warning on the Court's docket filing:

- Improperly coding claim closures to achieve performance metrics and/or plan forecast;
- Paying benefits on an under a reservation of rights (ROR) or on an "exceptional basis to be of service to the claimant" to achieve "paid recovery" performance metrics;
- Paying benefits without disability or eligibility being fully evaluated;
- Paying benefits prior to obtaining appropriate medical confirmation confirming disability determination.

Case 4:16-cv-40154-TSH   Document 1-6   Filed 10/25/16   Page 2 of 2

19. Rather than considering each claim on an individual basis, Unum Group has a stated goal of making "recoveries," a euphemism for not paying claims by setting company-wide goals to eliminate claims which frees funds tied up in claim reserves.

20. Unum Group has the ability to track financial data pertaining to claims, and review specific claims reserves attributable to a particular insured through databases that can be viewed through other databases sometimes called Operations Metrics and Reporting.

21. E-mails are routinely sent by management to the claims handlers that discuss monthly, quarterly, and yearly historic targets/goals, recoveries, reserves, expected resolution dates ("ERD"), and advance pay and close ("AP&C") of claims.

22. Financial information is tracked and shared with claims handlers in various software based documents.

23. Unum Group uses a euphemism "recoveries", "ERD", "AP&C" "outcomes" to mean terminating claims.

24. Unum Group permits claims handlers to learn about financial reserves, and requests that claims handlers make "recoveries" at specified times and to provide lists of Expected Resolution Dates ("ERD") on a specified basis. This may cause claims handlers to make benefit decisions based on financial goals rather than always examining the merits of each claim.

25. In 2005, Unum Group established the "Manager Toolkit 2005 Business Plan & BBS Communications The Business Center" which was the foundation for the Benefits Center Scorecards setting standards for liability acceptance rates and other metrics that impacted company profitability. A copy of the Manager Toolkit is attached herewith as **EXHIBIT C.**

26. "Manager Toolkit" directs managers to cascade information to employees so that they align their interests with the financial goals of the Unum Group.

27.  As the "Manager Toolkit" makes clear the more an individual or unit is perceived as contributing to the meeting of Unum Group's financial goals, the greater their share of the bonus pool.

28. Among other things, Unum sets goals for claim terminations, liability acceptance rates

and reopen rate goals, among other measures, and ties meeting such goals to the awarding of performance compensation. This is disclosed by the "Manager Toolkit 2005 Business Plan & BBS Communications The Business Center" read with the Scorecard reports.

29. Unum Group management sends to its Claim Directors, or makes available to the Claims Directors, Weekly Tracking – Quarter Review reports focusing on the number of claims that management expects will turn into a "recovery" at specified time periods. A copy of a Weekly Tracking – Quarter review report is attached herewith as **EXHIBIT D**.

30. Unum Group management sends to its Claims Directors, or makes available to the Claims Directors, IDI Director Scorecard reports focusing on the number of claims that it expects will turn into a "recovery" at specified time periods and whether projections have been met.  A copy of IDI Scorecard reports is attached herewith as **EXHIBIT E**.

31. IDI Scorecards are color-coded, green showing that expectation is being met, and yellow or red showing an expectation is not met.

32. These documents reflect that targets and goals for claim closures are set down to the unit level and that there are goals set for open claim recoveries, i.e., ongoing claims, per day.

33. Unum Group utilizes a "balanced business scorecard" approach—at least down to the director level – to keep claims personnel informed throughout the year on whether the company is meeting the financial goals it sets for itself in order to trigger incentive compensation.

34. These scorecards are evidence of the continuation of Unum Group's claims practices

which it promised to stop when it entered into the RSA.

35. Unum Group has various compensation programs available to different levels of employees, including the Management Incentive Compensation Plan ("MICP"), Long-Term Incentive ("LTI") plan for managers, including physicians who work for the defendants, and the Performance Recognition Plan ("PRP") for non-managers if not under the MICP, or other bonus programs set-forth in the Manager Toolkit 2005 Business Plan & BBS Communications The Business Center.

36. At all times relative hereto, Defendants have been operating under an inherent structural conflict of interest as the Unum Group, Unum Life and Provident are liable for benefits payable to Ms. Ovist from their own assets.

**B. Information about Rhonda Ovist and the LTD Plan.**

37. By occupation, Ms. Ovist is a former Associate Professor of Sociology at Rollins College.

38. Rollins College provided to its employees long-term disability insurance coverage through a long-term disability insurance plan that was fully insured by Unum Life and the Unum Group as identified in the long-term disability plan, policy number 69040 002 ("the LTD Plan").

39. To the extent not governed under ERISA, the LTD Plan is governed by the laws of the State of Florida.

40. At all times material hereto, Ms. Ovist was beneficiary and a participant in the LTD Plan, as defined by ERISA, 29 U.S.C. § 1002(7).

41.  The definition of disability in the LTD Plan provides

**HOW DOES UNUM DEFINE DISABILITY?**
  You are disabled when Unum determines that:
- you are limited from performing the material and substantial
duties of your regular occupation due to your sickness or injury;
and
- you have a 20% or more loss in your indexed monthly earnings
due to the same sickness or injury.
You must be under the regular care of a physician in order to be considered
disabled.

42.  The LTD Plan definition changes after 2 years to

After 24 months of payments, you are disabled when Unum determines that due
to the same sick or injury, you are unable to perform duties of any gainful
occupation for which you are reasonably fitted by occupation, education training
or experience.

43. Effective January 1, 2011, Unum Life and Unum Group determined that Ms. Ovist was

totally disabled from symptoms related to chronic pain, chronic fatigue syndrome and

fibromyalgia, and paid her for approximately 4 years.

44. The Social Security Administration describes Chronic Regional Pain Syndrome

*What Is RSDS/CRPS?*
RSDS/CRPS is a chronic pain syndrome most often resulting from
trauma to a single extremity. It can also result from diseases,
surgery, or injury affecting other parts of the body. Even a minor
injury can trigger RSDS/CRPS. The most common acute clinical
manifestations include complaints of intense pain and findings
indicative of autonomic dysfunction at the site of the precipitating
trauma. Later, spontaneously occurring pain may be associated
with abnormalities in the affected region involving the skin,
subcutaneous tissue, and bone. It is characteristic of this syndrome
that the degree of pain reported is out of proportion to the severity
of the injury sustained by the individual. When left untreated, the
signs and symptoms of the disorder may worsen over time.

45.  As described in the journal *Pain Medicine* Volume 3, Number 3, of *the American Academy of*

*Disability Evaluating Physicians (AADEP) Position Paper: Complex Regional Pain Syndrome I*

*(RSD): Impairment and Disability Issues* notes in part at page 6

**Functional Limitations**

When assessing functional capacities to perform
work activities or activities of daily living for patients
with CRPS, it is important to assess difficulties
associated with measurement of pain and functional
limitations associated with pain. The patient's
self-report about changes in pain level upon performance
of discrete physical activities, results of physician's
examinations, and functional capacity assessment
data provide a physician with tools for determining
functional abilities and limitations. The areas needing
to be addressed when assessing functional capacities
of CRPS patients must be determined and
appropriate data collected. The impact of CRPS on
whole person function (i.e., cognitive/emotional,
social, leisure/recreational, and vocational as well as
physical capacities) must be determined in order to
establish the extent of disability. Only when the relationships
among self-report of pain, functional
capacity assessment results, objective findings from
a physician's examination, and overt, verifiable indicators
of life function (such as ability to work,
interaction with others socially, involvement in recreational
and leisure activities, etc.) are clearly established
will the extent of disability be known.

The authors continue at page 8

From a vocational perspective, it is clear that upper
extremity impairments, associated functional
limitations, and chronic pain have a significantly
negative impact on the probability of working. The
ability to use the upper extremities for grasping and
manipulating is as critical to the performance of
highly skilled managerial and professional employment
in the age of computer keyboards as it is for
the unskilled worker doing hand assembly. Likewise,
CRPS affecting the lower extremities can lead
to difficulty standing. Standing is a critical physical
demand for performing essential job tasks associated
with skilled crafts, clerical tasks, machine operation/
feeding/off-bearing, and laboring, as well
as a number of service occupations on a sustained
basis. Roughly 63% of those surveyed said that pain
interfered with work "all the time," and another

18.2% said it interfered "some of the time." Sustaining
work activity over time following the onset
of CRPS may be difficult. As the severity and functional
limitation increase as one progresses through
the various stages of CRPS, the likelihood of work
on a full-time, part-time, or intermittent basis decreases.

Job loss resulting from absences, reduced productivity,
or functional inability to perform job demands
is particularly challenging for the CRPS patient.
As severity of symptoms increases, job loss
increases the likelihood of long-term unemployment,
a precursor to disability. Jackson et al. point
out that unemployment and its resultant loss of
wages and increased financial strain can result in
emotional turmoil [47]. Also, loss of purposeful use
of time, fewer opportunities for social contact, and
loss of social status or identity as a result of unemployment
have been found to erode well-being.
Findings from their survey of employed versus unemployed
volunteers supported the contention that
higher levels of pain resulted in increased emotional
distress, increased financial strain, and less
structured and purposeful time. Unemployment
was directly linked to financial strain, and financial
strain was directly linked to emotional distress. The
CRPS patient who is not working must endure
greater emotional distress and pain at a time when
diminishing pain is their primary goal. Unemployment
can easily be seen as a major contributor to
pain, and ultimately, disability.

46.  Ms. Ovist's medical conditions and symptoms did not improve with time.

47. In conformity with the LTD Plan terms, Ms. Ovist applied for benefits under the Social Security

   Act ("SSA").

48. Under the SSA, the term "disabled" means a person is incapable of engaging in "any substantial

   gainful activity" (42 U.S.C. § 423(d) (1) (A)); i.e., the person is entirely precluded from working

   on a regular basis.

49. The burden is arduous that a person must overcome in order to prove an inability to engage in "any substantial gainful activity."  42 U.S.C. § 423(d) (1) (A) (definition of "disabled" under Social Security disability program).

50. The United States Social Security Administration granted benefits and found her disabled from all gainful employment effective April 2012.

51. The First Circuit reiterated this point about six years ago that the SSA definition of disability is much narrower than Unum's own occupation and any occupation of disability

> After the expiration of the "own occupation" period under the policy (typically two years), a claimant needed to show that he was incapable of performing "any occupation" in order to continue to receive benefits. To assess whether a claimant was disabled under its "any occupation" standard, Unum would ask whether, based on the claimant's training, education, and experience, and given his restrictions and limitations, the claimant was capable of working in an occupation that could pay him sixty percent or more of his predisability earnings. SSA's evaluation of whether an applicant is capable of performing "substantial gainful activity" is similar, and, in fact, was referred to as "the Social Security Administration's 'any occupation' eligibility requirement" at trial; however, **Unum's "any occupation" analysis is less rigorous than the SSA's "any occupation" analysis.** When the SSA evaluates whether an applicant is capable of performing "substantial gainful activity," it does not limit the sphere of jobs which the applicant is capable of doing based on the applicant's predisability earnings.

> *U.S. ex rel. Loughren v. Unum Grp.,* 613 F.3d 300, 303-04 (1st Cir. 2010)(emphasis added)

52. Unum requested, and Ms. Ovistt complied with a request from Unum for a release so Unum could secure copies of her entire file with the United States Social Security Administration

53. In a letter dated January 25, 2013, Unum promised to Ms. Orvist that

> Once we obtain your SS claim file, if appropriate, will apply significant weight to the SS award of disability benefits. Significant weight means that the Social Security's judgment that you were disabled at the time of the award will weigh heavily in your favor as we making ongoing disability decisions under your LTD policy.

54.  Unum terminated benefits payments on various grounds, including allegations that Ms.

Ovist's diagnoses and symptoms, due to fibromyalgia and chronic fatigue syndrome,

were "self-reported."

55. A recently described by the Seventh Circuit Court of Appeals

And finally the American College of Rheumatology offers the following harrowing description of the disease: "Fibromyalgia is a neurologic chronic health condition that causes pain all over the body and other symptoms. Other symptoms of fibromyalgia that patients most often have are: Tenderness to touch or pressure affecting muscles and sometimes joints or even the skin. Severe fatigue. Sleep problems (waking up unrefreshed). Problems with memory or thinking clearly. Some patients also may have: Depression or anxiety. Migraine or tension headaches. Digestive problems: irritable bowel syndrome (commonly called IBS) or gastroesophageal reflux disease (often referred to as GERD). Irritable or overactive bladder. Pelvic pain. Temporomandibular disorder—often called TMJ (a set of symptoms including face or jaw pain, jaw clicking, and ringing in the ears)." American College of Rheumatology, "Fibromyalgia," www.rheumatology.org/I-Am-A/Patient-Caregiver/Diseases-Conditions/ Fibromyalgia.

*Kennedy v. Lilly Extended Disability Plan*, 856 F.3d 1136, 1137 (7th Cir. 2017).

56.  The Seventh Circuit held previously

ERISA plan's self-reported symptoms limitation, which limited to 24 months payments for disabilities due to sickness or injury that were primarily based on **self-reported symptoms, did not apply to plan participant who was diagnosed with disabling fibromyalgia;** the diagnosis was not primarily based on self-reported symptoms, but rather could be based on the verifiable evidence of its manifestations. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq. (emphasis added)

*Weitzenkamp v. Unum Life Ins. Co. of America*, 661 F.3d 323 (7th Cir. 2013).

57. Ms. Ovist appealed the decision of the Unum Group and Unum Life.

58. Ms. Ovist has exhausted all presuit remedies prior to filing this action.

**<u>COUNT I</u>**
**<u>BENEFITS DUE FROM UNUM GROUP, UNUM LIFE AND THE</u>**
**<u>LTD PLAN UNDER ERISA, 29 U.S.C. § 1132</u>**

59. Plaintiff incorporates all preceding paragraphs above as if fully restated herein.

60. ERISA §502(a)(1)(B), 29 U.S.C. §1132(a)(1)(B) permits a plan participant to bring a civil action to recover benefits due to her under the terms of a plan, to enforce her rights under the terms of a plan and/or to clarify her rights to future benefits under the terms of a plan.

61. Unum Group and Unum Life unlawfully terminated LTD Benefits payable to Ms. Ovist under the LTD Plan.

62. Defendants Unum Life and Unum Group operate under a conflict of interest in its dual role as payer of benefits, and the entity that decides eligibility for benefits.

63. The actions of Unum Life and Unum Group have caused damage to Plaintiff in the form of benefits lost as a result of the wrongful denial of her claim for long-term-disability benefits.

64. This Court must review the termination decision of both Unum Life and Unum Group *de novo*.

65. This Court must decide the benefits issue in a plenary proceeding.

## COUNT II
## AWARD OF ATTORNEY'S FEES AND COSTS UNDER
## 29 U.S.C. §1132(G) AGAINST ALL DEFENDANTS

66. Plaintiff incorporates all preceding paragraphs above as if fully restated herein.

67. As Unum Group and Unum Life unlawfully terminated benefits, and have caused Ms. Ovist to incur attorneys' fees and costs, and will cause her to incur additional fees and costs, Ms. Ovist is entitled to recover under 29 U.S.C. §1132(g), costs of this litigation, including reasonable attorneys' fees, and interest on all past due benefits.

**WHEREFORE,** Plaintiff Rhonda Ovist demands relief and judgment as follows:

1. Awarding plaintiff equitable relief under 29 U.S.C. §1132 declaring rights and duties of the Plaintiff and Defendants Unum Life Insurance Company of America and Unum Group with respect to past due benefits owed to the Plaintiff, and future benefits to be paid to the Plaintiff.

2. Awarding Plaintiff attorneys' fees, costs and interest under 29 U.S.C. §1132(g) against Defendants Unum Life Insurance Company of America and Unum Group.

3. For other such legal or equitable relief as this Court deems just and proper.

Respectfully Submitted

**RHONDA OVIST**

*/s/Jonathan M. Feigenbaum*
Jonathan M. Feigenbaum, Esq.
B.B.O. No.546686
184 High Street
Suite 503
Boston, MA 02110
Tel. No. : (617) 357-9700
FAX No.: (617) 227-2843
jonathan@erisaattorneys.com